636 So.2d 901 (1993)
Rosemary Lefevre EDWARDS, et al.
v.
Mr. and Mrs. Jerome J. CONFORTO.
J.J.C., INC., P.J., Inc. and William Colacurcio, III
v.
Rosemary Lefevre EDWARDS, Edward J. Lefevre, III, and Joann Lefevre Mullet.
No. 93-C-1192.
Supreme Court of Louisiana.
November 29, 1993.
Dissenting Opinion December 7, 1993.
Opinion Reversing Original Decision on Rehearing May 23, 1994.
Rehearing Denied June 24, 1994.
*902 Lillian M. Cohen, Raymond A. McGuire, Trent & Cohen, New Orleans, for applicant.
Jerald N. Andry, Gilbert V. Andry, Jeanne M. Andry, Andry & Andry, New Orleans, for respondent.
Dissenting Opinion of Justice Watson December 7, 1993.
ORTIQUE, Justice.[1]
This is an action by plaintiffs for the return of insurance proceeds distributed to defendants under a fire policy.

I.
The plaintiffs, J.J.C., Inc., P.J., Inc. and William Colacurcio, III, are the sublessees of premises numbered 423, 425 and 427 Bourbon Street in New Orleans, Louisiana. Colacurcio is the president of the two corporations, J.J.C., Inc. and P.J., Inc. Edward Lefevre, III had entered into a lease on these premises with Mr. and Mrs. Jerome J. Conforto on January 23, 1980. On August 1, 1981, the Confortos subleased the premises to J.J.C., Inc., P.J., Inc. Mr. Lefevre died soon thereafter, and the property passed by inheritance to the defendants, Rosemary Lefevre Edwards, Edward J. Lefevre, III, and Joann Lefevre Mullet who hold the property in indivision. The initial lease (1980 lease between Edward Lefevre and the Confortos) was for a term of thirty-one years four months and required the lessees at their expense to maintain fire insurance in the joint names of lessor and lessees, with a loss payable clause to the lessor against fire and extended coverage, in the amount of $50,000.00. The lease required the lessee to make all repairs of any kind at his own expense. The second lease (1981 subleases between the Confortos and J.J.C., Inc., and between the Confortos and P.J., Inc.) was for a term of fourteen years ten months and adopted the same terms as the initial lease. Under the terms of the sublease, J.J.C., Inc. was to pay one third (1/3) of the costs necessary to maintain insurance in the joint names of Edward Lefevre and Mr. and Mrs. Conforto, with a loss payable clause to Edward Lefevre, against fire and extended coverage in the amount of $50,000.00. The sublease between the Confortos and P.J., Inc. required the sublessee to pay two thirds (2/3) of the costs necessary to maintain insurance in the joint names of Edward Lefevre and Mr. and Mrs. Conforto, with a loss payable clause to Edward Lefevre, against fire and extended coverage in the amount of $50,000.00.
On January 9, 1985, a fire occurred at the Bourbon Street property, partially damaging the property. On January 10, 1985, the fire insurer, New Hampshire Insurance Co. issued a check to defendants for the fire damage in the amount of $21,540.00 payable to Rosemary Lefevre Edwards.

II.
On June 24, 1988, plaintiffs filed a Petition for the Return of Funds in the district court. Plaintiffs asserted that the $21,545.00 was due them, because they had paid the fire insurance premium on the property, and had in fact made the repairs to the property following the fire. At the trial on the merits, the trial court rendered judgment in favor of the defendants. The trial court relied on the following language from the sublease:
The sublease to J.J.C., Inc. by the Confortos and the sublease to P.J., Inc. by the Confortos both contain the requirement that lessee make all repairs of any kind at its own expense. See lines 175 & 176 of both leases. Those typewritten provisions, by terms of the lease, apply when in conflict with printed provisions of the lease contract.
The rationale for the trial court judgment is based on two lease provisions. The first provision is between the owners and the lessee, the sublessor and sublessees requiring the renter to make repairs of any kind. The second provision which appears in the lease between sublessor and sublessee allows, in the event the premises are destroyed by fire, the lessee the option of cancelling the lease, or borrowing money to rebuild the entire premises.
An appeal followed the trial court judgment in which plaintiffs contend as their sole assignment of error that defendant was unjustly *903 enriched by retaining the insurance proceeds. The appellate court affirmed the trial court decision, finding that plaintiffs claim of unjust enrichment to be without merit.[2]

III.
Upon application by plaintiffs, this court granted supervisory writs to consider whether the defendants have been unjustly enriched. The sole issue for consideration is whether the plaintiffs, sublessees of the leased premises, are entitled to the insurance proceeds in the amount of $21,545.00 paid to defendants. For the reasons expressed, we find the trial court and the appellate court erred in refusing to apply the doctrine of unjust enrichment.

IV.
In 1967 our jurisprudence recognized an action for unjust enrichment in Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967).[3] In Minyard v. Curtis Products, Inc. supra, 205 So.2d at 431, this court employed the action de in rem verso, reasoning as follows:
In all civil matters, where there is no express law, the judge is bound to decide according to equity. La.Civil Code art. 21 (1870). There is, moreover, in our law the moral maxim "that no one ought to enrich himself at the expense of another." La.Civil Code art. 1965 (1870). This latter article announces the principle of unjust enrichment.
This court has recognized five conditions which must be fulfilled in order to succeed in a suit by actio de in rem verso: (1) there must be an enrichment to the defendant; (2) there must be an impoverishment sustained by the plaintiff; (3) there must be a connection between the enrichment and resulting impoverishment; (4) there must be an absence of justification or legal cause for the enrichment and the impoverishment; and (5) the action will only be allowed when there is no other remedy at law i.e., the action is subsidiary or corrective in nature. Minyard v. Curtis Products, Inc., supra 205 So.2d at 432, citing Nicholas, Unjustified Enrichment in Civil Law, Part I, 36 Tul.L.Rev. 605, 610 (1962); Edmonston v. A-Second Mortgage Company of Slidell, Inc., 289 So.2d 116 (La. 1974); Kirkpatrick v. Young, 456 So.2d 622 (La.1984).
This court recognizes the compatibility of La.Civil Code art. 2301 with the doctrine of unjust enrichment. La.Civil Code art. 2301 provides as follows:
He who receives what is not due to him, whether he receives it through error or knowingly, obliges himself to restore it to him from whom he has unduly received it.

V.
Plaintiffs allege as their sole assignment of error that defendants were unjustly enriched by retaining the insurance proceeds. We agree that defendants were unjustly enriched under the facts and circumstances of this case. Plaintiffs paid for all repairs to the building that were occasioned by the fire in January 1985 out of their own funds. These repairs were made with the concurrence of the owners. Plaintiffs/sublessees made all arrangements for repair of the building; they made arrangements with insurance adjusters for the issuance of their check covering the cost of repairs to the building. New Hampshire Insurance Company issued a check for fire damage in the amount of $21,545.00 payable to the order of one of the owners, Rosemary Lefevre Edwards. The owners of the property agreed to turn over the proceeds as soon as six complaints and recommendations by the insurer had been completed. In accordance therewith the plaintiffs/sublessees completed the work in April 1987. However, the owners refused to tender the proceeds from the fire insurance, despite their earlier assurances that they would do so once all repairs had been satisfactorily completed.
*904 A review of the leases involved on the XXX-XXX-XXX Bourbon Street property does not support owners' claim that they are entitled to retain fire insurance proceeds. The plaintiffs bore the expense of the insurance premiums over the years.[4] They accepted the responsibility of making the repairs following the fire. They caused the repairs to be made. Plaintiffs took corrective measures demanded by the owner and the insurer. The repairs were completed in keeping with the owners/insurers demands.
Considering all of these facts, our conclusion is inescapable that, the trial court and the appellate court incorrectly determined that the owners were entitled to retain the insurance proceeds. The pleadings together with the trial testimony support an action for unjust enrichment, all as outlined hereinabove. The defendants/owners are enriched by the receipt and retention of the fire insurance proceeds in the amount of $21,545.00. The defendants/owners did not expend any money or furnish any compensation adequate to justify an interest in these proceeds. There is the correlative impoverishment to the plaintiffs/sublessees, who paid for all of the repairs necessitated by the fire, expecting that they would be reimbursed from the insurance proceeds. The enrichment and the impoverishment are connected. The amount of the insurance funds retained by the owners of the premises is the same amount expended by sublessees in expectation of reimbursement. There is no legal cause which justifies the enrichment or impoverishment. An unbiased consideration of the leases involved, does not support the impoverishment to plaintiffs. Contrary to the interpretations of the trial court and appellate court, there is no legal cause which justifies the enrichment to the owners. The clear and original intention of the owner was to relinquish the funds, once the work was completed. In support of this proposition, the record contains a letter from Mrs. Edward's attorney to the Confortos, dated March 7, 1985 indicating that the check for property loss due to fire had been received by the owners, that it had been conveyed to the owners that the fire damage had not been repaired along with certain recommendations from the insurance company. The owners indicated that they were going to retain the proceeds until such time as the work was completed. One of the owners testified in her deposition that "... the check came as a shock. I didn't even know I was going to receive the check."
There is no other remedy available to impoverished plaintiffs/sublessees by which the impoverishment might have been reasonably avoided. The insurance policy covered only fire damage repairs. The policy was procured to protect the owner in the event that renter failed to make the repairs necessitated by fire. Plaintiffs/sublessees made the repairs at their expense. Once these repairs were completed, there is no conceivable loss to the owners. The insurance proceeds in the amount of $21,545.00 would come as a windfall to owners. There is no equitable interpretation of the property leases involved in this case supportable by public policy which would allow the double recovery sanctioned by the lower courts. Therefore, this court holds that the doctrine of unjust enrichment applies in this case.
Plaintiffs have unequivocally proven the prerequisites for unjust enrichment as set forth in our jurisprudence. Plaintiffs are accordingly entitled to reimbursement by the owners in the amount of $21,545.00 for repair expenditures necessitated by the fire damage.

DECREE
For the reasons assigned, the judgment of the trial court and the Court of Appeal finding no merit to plaintiffs' claim of unjust enrichment are reversed and set aside. Judgment is entered in favor of plaintiffs, *905 J.J.C., Inc., P.J., Inc. and William Colacurcio, III and against defendants, Rosemary Lefevre Edwards, Edward J. Lefevre, III and Joann Lefevre Mullet in the total amount of $21,545.00 together with legal interest from date of judicial demand until paid. It is further ordered, adjudged and decreed that defendants, Rosemary Lefevre Edwards, Edward J. Lefevre, III and Joann Lefevre Mullet are cast for the costs of these proceedings.
REVERSED AND RENDERED.
CALOGERO, C.J., and LEMMON and MARCUS, JJ., concur.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
The fire insurance proceeds belonged to the owners to use as they chose. If the plaintiffs made repairs without a promise from the owners to repay them, then they have no claim to the proceeds of the insurance policy. They had no discreet insurable interest.
I respectfully dissent.

ON REHEARING
CALOGERO, Chief Justice.[*]
In this contest over $21,545.00 of fire insurance proceeds between the premium paying sublessee and the loss payee property owner we held in favor of the sublessee on original hearing, finding that the owner would otherwise be unjustly enriched.
Upon application of the Defendant owners, we granted a rehearing and now determine that neither unjust enrichment nor any other legal theory supports favoring the sublessees in the face of clear contractual provisions dictating the present result. We therefore upset our original opinion and affirm the judgment of the court of appeal in favor of the property owner lessor.
The plaintiffs, J.J.C., Inc., P.J., Inc. and William Colacurcio, III, are sublessees of commercial property located at XXX-XX-XX Bourbon Street, New Orleans, premises used in part for a massage parlor. The property is owned in indivision by Rosemary Lefevre Edwards, Edward J. Lefevre, III, and Joann Lefevre Mullet who inherited it from their father, Edward Lefevre. Apparently the property has been under lease from Edward Lefevre to Conforto since 1969, with leases having been executed on July 9, 1969, May 17, 1975, January 9, 1980 and pertinent to this litigation a thirty-one year, four month lease executed on January 23, 1980. Under the terms of this most current lease (and probably the previous leases as well), the Confortos were obligated to secure and maintain insurance "in the joint names of Lessee and Lessor, with a loss payable clause to Lessor against fire and extended coverage in the amount of $50,000.00 ..." The Lessee Conforto was also required to make "all repairs of any kind" at his own expense. The standard fire clause[1] printed in the lease form which was used was stricken through, and the following typewritten provision substituted in its place.
"In the event the premises are destroyed by fire or other casualty, or damaged to such an extent as to render them wholly unfit for occupancy, then this lease may be canceled at the option of the Lessee ..."
The apparent reason for the typewritten provision in place of the stricken printed provision was to delete reference to repairability within 120 days, lessor/lessee options and obligations, and reduction or remission of rent in the event of destruction of the premises by fire. The typewritten substitution simply spoke to cancellation at the option of the lessee in the event of destruction *906 or virtual destruction by fire.[2] The chosen provision was obviously designed to work in tandem with the lessee's obligation to make "all repairs of any kind," the exception being only in the event the premises were destroyed by fire or other casualty.
Starting in 1979, Conforto subleased the property to Colacurcio and/or his corporations, the most recent subleases having been executed on August 4, 1981, eighteen months after the current January 23, 1980 lease went into effect. Those subleases were to Colacurcio's two corporations, J.J.C., Inc. and P.J., Inc., in entirely separate sublease documents. The terms of the subleases differed from the January 23, 1980 lease in at least two respects. The printed fire clause in the similar lease form remained part of the sublease, and the responsibility for maintaining fire insurance was divided between the two corporate sublessees. Just as in the original lease, however, the subleases called for Edward Lefevre to be designated, on a fire insurance policy in the amount of $50,000.00, as the sole loss payee, and sublessee was required to make "all repairs of any kind" at his own expense.
On January 9, 1985, a fire partially damaged the leased property. The following day, Ms. Edwards received a check made payable to her, as heir of Edward Lefevre, in the sum of $21,545.00 from New Hampshire Insurance Company. Although Ms. Edwards' attorney told lessee Conforto that his client would surrender the insurance funds when the repair work was completed, the insurance proceeds were not thereafter turned over to the lessee or to the sublessees.
On June 24, 1988, Plaintiffs filed this lawsuit to recover the $21,545.00. This followed defendants' having filed suit to evict the lessees and sublessees. The cases were consolidated.[3] Plaintiffs assert that they are owed the $21,545.00 plus interest because they paid the insurance premiums, 2/3 by P.J., Inc. and 1/3 by J.J.C., Inc., and made the necessary repairs. The cases were tried together and the district court rendered judgment in favor of Defendant owners in the sublessees' suit to recover the insurance proceeds (while ruling against the owners on their eviction suit). The court was impressed by the fact that the Plaintiffs' subleases from Conforto, as well as Conforto's lease from Lefevre, contained typewritten provisions which bound the sublessee to make all repairs of any kind at its own expense, typewritten provisions which, thus recited, are to be favored when they conflict with printed provisions of the lease.
On appeal, Plaintiffs argued that Defendants had been unjustly enriched by receipt and retention of the insurance proceeds. The court of appeal, in affirming the trial court, agreed that this unjust enrichment claim had no merit. Edwards, et al. v. Conforto, et al., 615 So.2d 400 (La.App. 4th Cir. 1993). The court pointed out that "[t]he fire provision in the original lease was entirely deleted and a specific provision was added granting the lessee the option of canceling the lease if the premises were destroyed by fire ..." Id. The court determined that this substitution indicated that "the owner had no intention of repairing fire damage." Id. The court also noted that "the lease was a long-term lease, in excess of 31 years, at a fixed monthly rental of less than $2,000.00." Id.
This Court granted writs, took the case up and reversed the court of appeal, concluding *907 that the principles of actio de in rem verso, the civilian counterpart to unjust enrichment were applicable and these plaintiffs, sublessees, were entitled to the insurance proceeds. As earlier indicated, we granted rehearing on application of Defendant owners/lessors. Upon reconsideration we conclude that unjust enrichment does not apply in this case.
This court in Minyard v. Curtis Products, Inc., 205 So.2d 422, 432 (La.1967), set forth the required elements for a showing of unjust enrichment. The five prerequisites are: 1) an enrichment on the part of the defendant; 2) an impoverishment on the part of the plaintiff; 3) a causal relationship between the enrichment and the impoverishment; 4) an absence of justification or cause for the enrichment or impoverishment; and 5) no other remedy at law. Regarding the fourth prerequisite, we stated in Edmonston v. A-Second Mortg. Co. of Slidell, Inc., 289 So.2d 116, 122 (La.1974), that if there is a contract between the parties it serves as a legal cause, an explanation, for the enrichment. "[O]nly the unjust enrichment for which there is no justification in law or contract allows equity a role in the adjudication." Id. (emphasis added).
Unjust enrichment is without application in this case because there is no absence of justification or cause for the enrichment. The justification or cause for the lessor's enrichment was the contractual agreement between the parties. Under the lease and the sublease contracts, Conforto and his sublessees, J.J.C., Inc. and P.J., Inc., were responsible not only for repair of all fire damage to the leased premises (absent destruction, in which event lessee, and sublessee, had the option to cancel) but also to pay the insurance premiums and furnish $50,000.00 fire insurance with Edward Lefevre as sole recipient (designated loss payee) in the event of fire. Unjust enrichment has no application here.
A troubling aspect of this case, and a matter regarding which Plaintiff sublessees presented successful equitable argument on original hearing is the deposition testimony of one of the three lessors, Rosemary Lefevre Edwards. She stated that she did not know that she was going to receive the check and that she thought that the money was to repair the fire damage. It was also shown that her lawyer wrote not to the Colacurcio interests, but to sublessor Conforto expressing that Ms. Edwards was going to retain the insurance proceeds until the fire damage had been properly repaired.
Ms. Lefevre's reaction, and assumption, when she received the check, evincing an ignorance concerning the terms of the contract and the rights of her co-lessors and herself, and her lawyer's unilateral assurance do not represent any agreed upon amendment to the existing lease and sublease contracts.
Only promissory estoppel could conceivably create in sublessees a right to enforce the Lefevre lawyer's "promise" (in point of fact, an expressed intention). But that principle is unavailing for two reasons. Plaintiffs did not specifically plead promissory estoppel, and, of course, that is necessary. Thebner v. Xerox Corporation, 480 So.2d 454, 48 (La.App. 3rd Cir.1985). More significantly however, a party urging estoppel must show a representation by conduct or words, justifiable reliance, and change in position to his detriment because of reliance. Spataro v. State Through Dept. of Public Safety and Corrections, 577 So.2d 795 (La.App. 2nd Cir. 1991).
Because the sublessees had the contractual obligation to repair the damage at their own expense, their doing so could not have been a change in position to their detriment, prompted by lessors' lawyer's "promise." Plaintiffs already had the contractual obligation to repair the damage with no right to walk away from the premises and the lease/sublease obligation, for the premises had not been destroyed "by fire or other casualty, or damaged to such an extent as to render them wholly unfit for occupancy."[4]
Consequently, the principle of equitable estoppel also has no application in this case.
*908 For the foregoing reasons, the provisions of the lease and subleases, specifically created in lessor a right to the fire insurance proceeds with no corresponding obligation to repair the undestroyed but fire damaged premises, the latter obligation, vis a vis the lessor, resting with lessee Conforto and/or Plaintiffs, J.J.C., Inc. and P.J., Inc. Neither actio de in rem verso, civilian counterpart to unjust enrichment, nor equitable estoppel are applicable in this case. Plaintiff sublessees are, therefore, not entitled to a return of the insurance proceeds from Defendant lessors.

DECREE
Accordingly, the judgment of this court on original hearing is reversed and the judgment of the court of appeal reinstated.
JUDGMENT ON ORIGINAL HEARING REVERSED; JUDGMENT OF COURT OF APPEAL REINSTATED.
HALL, ORTIQUE and LEMMON, JJ., dissent and assign reasons.
HALL, Justice, dissenting.
The lease requires that the lessee maintain fire insurance "in the joint names of Lessee and Lessor" (indicating that both are to be named insureds), "with a loss payable clause to Lessor" (indicating that the proceeds are to be payable to the Lessor), in the amount of $50,000 "or such other amount as may be subsequently agreed upon by Lessee and Lessor" (indicating that both lessor and lessee have an interest in the amount of insurance).
In a subsequent paragraph, the lease provides that if the premises are destroyed by fire or damaged to an extent rendering them wholly unfit for occupancy, the lessee can cancel the lease or repair the premises at lessee's expense. The lease does not provide for the circumstance where the premises are damaged by fire to a lesser extent, as is the case here, unless the contractual obligation of the lessee to make "all repairs of any kind" places the cost of repairing the fire damage on the lessee.
The maintenance of insurance clause, while making the proceeds payable to the lessor, does not spell out specifically whether the proceeds are to be used for repair of fire damage, whether total or partial destruction, or, as here, relatively minor damage not making the premises unfit for occupancy.
The provisions of the contract are not clear and require a reasonable interpretation by the court in accordance with the apparent intent of the parties.[1] The most reasonable interpretation is that the insurance was to be maintained in both parties' names for the benefit of both parties as their interests might appear. The proceeds are payable to the lessor to facilitate payment by the insurer and to give the lessor control of the proceeds. The lessee was, perhaps, obligated to make the repairs at its expense under the obligation to make repairs of all kinds. If the lessee did not make the repairs, then the lessor could retain the insurance proceeds and either repair or not. If the lessee made the repairs to the owner's satisfaction, then surely it was intended that the lessee, as a named insured, should have the benefit of the insurance proceeds. Surely it was not intended that the lessor would retain the *909 insurance proceeds as a sort of windfall or profit even though the lessee repaired the fire damages at its expense.
The lessor's actions after the fire are consistent with this interpretation of the contract. Mrs. Edwards testified that she assumed the insurance money would be used for the repairs. The lessor's attorney advised the lessee that the proceeds would be paid to the lessee when repairs were satisfactorily completed.
The judgments of the district court and court of appeal should be reversed and judgment rendered in favor of plaintiffs for the amount of the insurance proceeds. I respectfully dissent from the majority opinion holding to the contrary.
ORTIQUE, Justice, dissenting.
I respectfully dissent.
The majority incorrectly interprets the lease/sublease by interrelating the "fire-loss payable" clause with the "all repairs" clause.
Our Civil Code mandates that each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the policy as a whole. LSA-C.C. art. 2050. The clear implication of this mandate is that two clauses should not be read in isolation of the rest of the contract. Nonetheless, the majority is reading the "fire-loss payable" clause in tandem with the "all repairs" clause, as if the lease/sublease expressly ties the two clauses together, in disregard of the rest of the provisions of the contract. In doing so, in my opinion, the majority errs.
The various provisions in the lease/sublease provide for a long-term lease period (14 years, 10 months), at a relatively low rent for its location (lease $1,600 a month; sublease $2,500 a month), where (ultimately) the sublessee is responsible for the upkeep and the repairs of the leased premises (including plumbing, heating, elevators, machinery, etc.), for payment of its utility bills, (2/3 of its) taxes and (2/3 of its) insurance (the lessee/sublessor pays the other 1/3). The lease also provides that the lessor keeps all improvements made by the lessee/sublessee, no matter how attached, and the lease/sublease shall be cancelled if the premises are destroyed by fire if through no fault, neglect or design of the lessee/sublessee. Further, the two provisions melded together by the majority provide as follows:
As further consideration of this lease, Lessee agrees to bind himself (a) to pay punctually all city and state taxes, except income and inheritance taxes, which may be levied or assessed against the leased property, and to deliver to Lessor all tax receipts for the same; and (b) as further consideration of this lease, Lessee agrees to bind himself to maintain, during the term of this lease, at Lessee's expense, insurance in a solvent company, doing business in the State of Louisiana, in the joint names of Lessee and Lessor, with a loss payable clause to Lessor against fire and extended coverage in the amount of $50,000.00, or such other amount as may be subsequently agreed upon by Lessee and Lessor.
Lessee further agrees to maintain the property in good condition; to make, at his own expense, all repairs of any kind; to pay all bills for water, sanitation and garbage charges, light, gas and other services.[1]
After applying the general rules of interpretations of contracts, Civil Code articles 2045-2057, it seems clear that the proper interpretation of the lease/sublease as a whole shows the parties intended for the lessor/sublessor to collect rents and have minimal interaction with the care of the leased premises, placing the primary obligation for the care of the leased premises on the sublessee. However, since the lease/sublease provides for cancellation of the contract if the premises are destroyed by fire, the parties intended for the lessor to receive the $50,000 fire insurance payment so lessor would have funds to repair/rebuild the ravaged premises instead of the lessee/sublessee receiving the funds but having no corresponding *910 obligation to use it to repair the premises. In the event of fire, but the lease was not canceled, the parties also intended for the lessor to receive the insurance proceeds so that lessor would have leverage to require that all of the insurance proceeds were in fact used for the repair of the building and to insure that none of the proceeds were merely pocketed by the lessee/sublessee to the detriment of the leased premises.
Nothing in the contract insinuates the parties intended for the lessor to keep the insurance proceeds when the lease was not canceled and the sublessee was making the repairs! Such an interpretation is, in my view, illogical and leads to an absurd result, as it gives the lessor a "windfall" not contemplated by the parties. The parties did not intend for the lessor to keep the insurance proceeds and also retain the benefit of the repairs made at the sublessee's expense at the conclusion of the lease!
Moreover, the parties' conduct throughout the period in which the repairs were being made is consistent with the contract interpretation that the insurance proceeds were intended to ultimately pay for the sublessee's repairs and not be permanently retained by lessor. First, the lessor and lessor's attorney verbally acknowledged the interpretation that the sublessee would be given the proceeds after the repairs were made, then lessor also forced the sublessee to make certain repairs to the premises according to the insurance company's specifications. If the sublessee's ultimate receipt of the insurance proceeds had not been tied to the repairs the sublessee made to the premises, it is unlikely that the sublessee would have made those exacting repairs. Instead, sublessee would merely have repaired the premises according to its own needs. Thus, in my opinion, the foregoing demonstrates the majority misinterprets the lease/sublease.
The majority also errs in finding the lessor has not been unjustly enriched by retaining the insurance proceeds. The lessor's interest in the insurance proceeds was limited to ensuring that the repairs for which the proceeds were remitted, were actually made. Lessor was named as payee solely to protect lessor in case the sublessee failed to make the necessary repairs. The lessor gained the sublessee's compliance to fully submit to the insurer's recommendations by dangling the insurance proceeds in front of it and predicating sublessee's receipt of the proceeds on the completion of those repairs. The sublessee made all the required repairs, at its own expense. Nonetheless, the lessor refused to turn over the proceeds to which sublessee is fully entitled. In my opinion, this situation satisfies all five (5) elements of unjust enrichment.[2]
Finally, the majority errs in allowing lessor to retain the insurance proceeds which it used for an immoral, if not a dishonest, purpose. The lessor and lessor's attorney promised to turn the funds over to sublessee after the specified repairs were made. Sublessee acted on that promise to its detriment by making all of the specified repairs. Under these facts, lessor should be estopped from retaining both the insurance proceeds and the repaired premises, since it will retain the repairs paid for by sublessee at the termination of the lease/sublease. The court should not reward the lessor for such chicanery. The majority decision rewards the lessor's duplicity by giving lessor an unearned and undeserved gain.
For the foregoing reasons, I respectfully dissent.
LEMMON, Justice, dissenting.
This case turns on whether the contractual provision requiring the sublessees to make "all repairs of any kind" entitles the lessee to keep the fire insurance proceeds after the sublessees, who paid for the fire insurance, have repaired the fire damage at their expense.
The principal lease and the sublease together obligated the sublessees to maintain *911 the property in good condition and to make all repairs at the sublessees' expense. While the lease provision used the term "all repairs of any kind," the use of that term in the typewritten maintenance clause (which also specifically required the sublessees to pay utilities and garbage fee) does not necessarily require the sublessees to bear the ultimate cost of repair of damage caused by fire and covered by insurance provided by the sublessees, particularly when the requirement for the sublessees to provide fire insurance in a fixed amount in favor of the lessor was covered in a separate typewritten lease provision.
Fire insurance is normally purchased to pay for the repair of fire damage. The leases in this case did not provide to the contrary. I would interpret the separate provisions referring to premises maintenance and to insurance as expressing the intent of the parties that the insurance proceeds are to be paid to the lessors who may hold the proceeds only until the sublessees satisfactorily perform their obligation to repair the fire damage. It is unlikely that the lessor bargained for a windfall collection of insurance proceeds when a fire occurs which does not substantially destroy the building. But if the lessor did so bargain, such an intent (to keep fire insurance proceeds after the sublessees paid to repair the fire damage) should have been expressly stated in the contract (just as the intent to indemnify a contracting party for damages caused by the indemnitee's own negligence must be stated expressly). Since this contract did not expressly require the sublessees to pay for fire damage without entitlement to reimbursement by the proceeds of the fire insurance policy paid for by the sublessees, I would not allow the lessor this "double recovery."
NOTES
[1] Pursuant to Rule IV, part 2, § 3, DENNIS, J. was not on the panel which heard and decided this case. See footnote in State v. Barras, 615 So.2d 285 (La.1993).
[2] Edwards, et al. v. Conforto, et al., 615 So.2d 400 (La.App. 4th Cir.1993).
[3] See Albert Tate, Jr., The Louisiana Action for Unjustified Enrichment: A Study in Judicial Process, 51 Tul.L.Rev. 466 (1977) for a discussion of the subject.
[4] The appellate court incorrectly interprets a pivotal fact in this case. The court of appeal surmised that "... Plaintiffs maintained that the owners did not pay the insurance premiums nor did they pay the costs of the fire repairs. They argue further that they were justified in their expectation that they would receive the insurance funds because they paid for the damages caused by the fire and two-thirds of the costs for insurance premiums. The lessee, the Confortos, paid the remaining one-third of the insurance premiums." Edwards v. Conforto, 615 So.2d 400 at 402 (La.App. 4th Cir.1993). The record supports the fact that plaintiffs/sublessees paid the entire insurance premium in the proportions of 2/3's by P.J., Inc., and 1/3 by J.J.C., Inc.
[*] DENNIS, J., not on the panel. Rule IV, part 2, § 3.
[1] The standard fire clause, which was crossed through on the original lease, read as follows:

If through no fault, neglect, or design of Lessee, the premises are destroyed by fire or other casualty or damaged to such an extent as to render them wholly unfit for occupancy, then the lease shall be canceled. If, however, the premises can be repaired within 120 days from the date of fire or casualty, then this lease shall not be canceled, and Lessor shall notify lessee within ___ days from date of fire that Lessor will repair the damage, and Lessee shall be entitled to such a reduction or remission of rent as shall be just and proportionate.
[2] Generally, under Civil Code art. 2715, a lessee is responsible for making all necessary repairs "which it is incumbent on lessee to make, unless the contrary has been stipulated." Also, art. 2723 provides that a lessee is only responsible for fire damage repairs "when it is proved that the same has happened either by his own fault or neglect, or by that of his family." La.Civ.Code Ann. art. 2715 (West 1954) (emphasis added). However, it is only in the absence of a specific provision that the Civil Code articles would be applicable. Here, express lease provisions furnish the rights and obligations of the parties in the event of fire.
[3] In the suit to evict, the Defendants alleged that the tenants had failed to properly and adequately maintain the property. The suit further alleged that the tenants had structurally altered the premises. The majority of the testimony at trial concerned the suit to evict the Plaintiffs from the subleased premises. The testimony revealed that Plaintiffs, over a ten year period, had spent in excess of $150,000 in repairs to the building, apparently consistent with the subleases' provisions requiring sublessee to make "all repairs of any kind" at sublessee's expense.
[4] This language appeared in the Lefevre-Conforto lease as a typewritten substitution and in the standard fire clause made part of the Conforto-Colacurcio sublease.
[1] Generally, under LSA-C.C. art. 2692, the lessor is bound to maintain the premises in a condition such as to serve for the use for which it is leased. Article 2693 obligates the lessor to make all the repairs which may accidentally become necessary, except those which the tenant is bound to make. Fire damage is not among the repairs a lessee is required to make under subsequent code articles. Article 2717 provides that the expense of repairs which unforeseen events may render necessary must be supported by the lessor, even though such repairs be of the nature of those which are usually done by the lessee.

Articles 2697 and 2723 regulate the consequences of destruction of the leased premises by an unforeseen event or by fire. If the premises are totally destroyed, the lease is at an end. If the premises are partially destroyed, the lessee may either demand a diminution in rent or revocation of the lease. Article 2697. A lessee can only be liable for destruction occasioned by fire when caused by the lessee's fault or neglect. Article 2723.
As correctly noted in the majority opinion, the Civil Code articles are not applicable where there are express provisions in the lease. Here, the lease contains provisions relating to repairs generally, to major fire damage, and to maintenance of fire insurance; thus, the Code articles are not applicable. But the provisions are unclear and ambiguous, requiring interpretation.
[1] These provisions were taken from the lease. The sublease differs, but for purposes of this discussion, not materially.
[2] The five (5) elements of unjust enrichment as applied herein are 1) an enrichment on the part of the lessor; 2) an impoverishment on the part of the sublessee; 3) a causal relationship between the enrichment and the impoverishment; 4) an absence of justification or cause for the enrichment or impoverishment; and 5) no other remedy at law. Minyard v. Curtis Products, Inc., 205 So.2d 422, 432 (La.1967).