# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-31121

United States Court of Appeals
Fifth Circuit

**FILED**

October 18, 2019

Lyle W. Cayce
Clerk

CHRISTOPHER E. CENAC, JR., Doctor; AUDRA CENAC, Doctor,

Plaintiffs - Appellants

v.

ORKIN, L.L.C.,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before DAVIS, HO, and ENGELHARDT, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Plaintiffs, Drs. Christopher and Audra Cenac, appeal the district court's summary-judgment dismissal of their claims against Defendant, Orkin, L.L.C. The Cenacs contracted with Orkin to protect their property against termites. In 2015, they discovered their home had become infested with Formosan termites. Orkin contends that, based on various contractual provisions, it is not liable for the cost of repairing the damage. The Cenacs filed this 28 U.S.C. § 1332 diversity action against Orkin asserting numerous claims under Louisiana law. We AFFIRM the district court's dismissal of all claims except the Cenacs' claim that Orkin was negligent or grossly negligent in directing and approving installation of a vapor barrier under their home. As to that claim, we VACATE the district court's judgment and REMAND.

No. 18-31121

## I. Factual Background

In 2004, the Cenacs bought a house in Houma, Louisiana, from Allen Eschete. Eschete had a contract with Orkin, executed in 1991, entitled "Subterranean Termite Agreement" (1991 Agreement), in which Orkin agreed to treat the house for the prevention of subterranean termites. The contract also provided for an "Orkin Continuous Protection Guarantee" in the form of a "Full Renewable Subterranean Termite Home Ownership Repair Guarantee" (OR Guarantee). The OR Guarantee obligated Orkin to retreat when required and to repair any new damage to the house or its contents caused by subterranean termites.[1] The 1991 Agreement provided in the title of the agreement and at the conclusion of the paragraph containing the OR Guarantee: "**DOES NOT PROTECT AGAINST FORMOSAN TERMITES.**" In their complaint, the Cenacs alleged that the OR Guarantee was transferred to them, with Orkin's approval and agreement, when they purchased their home from Eschete.

In 2007, Orkin sent the Cenacs a letter informing them that when their home was originally treated, "the treatment and termiticides used were designed to stop the Native Subterranean Termite." The letter explained that such treatment was ineffective against the Formosan termite and that a "new termiticide was developed to stop and kill the Formosan and the Native Subterranean Termite." The letter stated that Orkin was making a "special offer" to its current customers who did "not have Formosan Termite coverage." It further provided: "This Supplemental Treatment will not affect your current coverage in any way at all. This treatment allows Orkin to retreat your home

---

[1] The OR Guarantee required the homeowner to establish that the new damage was caused by subterranean termites within the effective period of the guarantee and that, at the time of discovery of the new damage, the damaged areas were infested with live subterranean termites.

2

with the new termiticides designed to stop and kill Formosan and Native Subterranean termites."

The Cenacs met with an Orkin representative in June 2007, at which time they paid Orkin an additional sum of money to have their home, as well as a large shed on the property, treated with the new termiticides for protection against both Formosan and subterranean termites. The Cenacs also executed two written contracts at that time: (1) a "Special Service Agreement" (SSA) and (2) a "Residential Single Family Dwelling, Louisiana Formosan and Subterranean Termite Retreatment Agreement, Orkin Continuous Protection Plan" (CPP). The Cenacs contend that the Orkin representative assured them during the meeting and afterwards that they were obtaining an OR Guarantee, including the damage repair part of that guarantee, for all types of termites. The Cenacs thus believed that their 2007 transaction with Orkin expanded the OR Guarantee such that Orkin was contractually obligated to repair damage caused not only by native subterranean termites, but also by Formosan termites.

From 2004 through 2015, an Orkin representative inspected the Cenacs' home for evidence of termite infestation and any conditions that might be conducive to termite infestation. In 2013, Orkin noted on an inspection report that a condition conducive to termite infestation was present at the home. Specifically, the report noted that there was excessive moisture in the crawl space of the home. The Cenacs alleged that they "took corrective measures at [Orkin's] direction, which [Orkin] approved as adequate." They asserted that, as directed by Orkin, they installed a vapor barrier under their home, and that an Orkin representative approved the installation. The Cenacs further alleged that Orkin continued to accept their payments and "assure[d] them that they still qualified for [Orkin's] warranty coverage."

3

No. 18-31121

In May 2015, the Cenacs noticed termites swarming around and coming out of one of the windows of the second floor of their house. They immediately notified Orkin, and Orkin sent out a technician to retreat the area near the window. The Cenacs vacated their home for two days during this time, but when they returned, they found more, larger swarms of termites coming from two windows near the window that had been retreated.

The Cenacs notified Orkin again, and after assessing the situation, Orkin advised them that "certain destructive work to the interior" of the home would be necessary to investigate further areas of potential termite activity. The Cenacs alleged that Orkin agreed to reimburse them for the costs associated with such destructive investigation. They further alleged that upon Orkin's advice and authorization, they hired a contractor to perform some interior demolition in their home. The contractor discovered live, active Formosan termites and extensive termite damage in the kitchen area of the home. The Cenacs contended that although Orkin authorized the demolition and expressly agreed to reimburse them, Orkin refused to reimburse them for the initial destructive work.

After their discovery of termites in the kitchen, the Cenacs discovered other areas of live termites and termite damage in their home. They contended that Orkin "failed and refused to participate with [them] in the necessary investigation of termite activity and damage, or to commit to repairing [their] home." By September 2015, the Cenacs' home was uninhabitable and in a state of partial destruction. They were forced to vacate their home indefinitely until the full extent of the termite infestation was uncovered, their home retreated, and repairs of the termite damage and investigatory demolitions completed.

Because Orkin refused to accept responsibility for the Formosan termite damage, the Cenacs filed the instant lawsuit. They also hired contractors to do more demolition in order to locate all termite activity and damage, removed

4

## No. 18-31121

and placed in storage all contents of their home, and moved into a trailer home on their property.

On April 18, 2016, Orkin paid the Cenacs $222,168, of which $81,800 was to reimburse them for relocation expenses and the lease of a trailer home, and of which $140,368 was for demolition expenses and the "estimated cost to repair the termite damage." The Cenacs contend, however, that various contractors have estimated that it will cost between $860,000 and $1.6 million to repair and rebuild their home.

## II. Procedural History

In their complaint, the Cenacs assert claims against Orkin for (1) violation of the Louisiana Unfair Trade Practices Act; (2) breach of contract; (3) breach of an insurer's duties of good faith and prompt payment under the Louisiana Insurance Code; (4) detrimental reliance; (5) unjust enrichment;[2] (6) negligence and/or gross negligence; and (7) negligent misrepresentation.

In its answer, Orkin admitted that it entered into the 1991 Agreement with Eschete, that the 1991 Agreement was subsequently transferred to the Cenacs after they purchased the property, and that the Cenacs paid the annual renewal fee for that contract following the date of transfer. Orkin further admitted that it entered into the Special Service Agreement (SSA) with the Cenacs in 2007.

Orkin subsequently filed a motion for summary judgment seeking dismissal of all the Cenacs' claims based on the provisions of the 1991 Agreement[3] and based on the provisions of the Orkin Continuous Protection Plan (CPP). Orkin pointed out that the CPP provided for a 10-year renewable

---

[2] The Cenacs later conceded that they do not have a claim for unjust enrichment.

[3] Orkin contended that although the 1991 Agreement was transferred to the Cenacs in 2004, the OR Guarantee was not transferred. Orkin further argued that even if the OR Guarantee was transferred to the Cenacs, it specifically did not apply to Formosan termites.

No. 18-31121

Formosan and subterranean termite retreatment service but expressly provided that Orkin's service did "not cover any damage to the structure or its contents." Furthermore, the CPP provided that the customer "expressly release[ed] Orkin from any claims for termite damage or repair." Orkin contended that its liability consequently was limited to retreatment only and that it had no liability for any repairs to the home or its contents. Orkin also filed five partial motions for summary judgment addressing individually the various claims asserted by the Cenacs and seeking dismissal.

The Cenacs also filed a motion for summary judgment requesting the district court to determine, as a matter of law, that all provisions of the 1991 Agreement, including the entire OR Guarantee, were transferred to them when they purchased the home.

The district court granted the Cenacs' motion for summary judgment.[4] It also granted all of Orkin's summary judgment motions, ultimately dismissing the entirety of the Cenacs' claims.[5] The Cenacs timely appealed.

### III.   Discussion

This court reviews a district court's grant of summary judgment de novo.[6] Under Rule 56 of the Federal Rules of Civil Procedure, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[4] Orkin has not appealed the district court's ruling that the entirety of the 1991 Agreement, including the OR Guarantee, was transferred to the Cenacs.

[5] The district court initially denied in part Orkin's summary judgment motion seeking dismissal of the Cenacs' contractual claims, but then later granted a subsequent summary judgment filed by Orkin, dismissing the Cenacs' entire complaint.

[6] *Apache Corp. v. W & T Offshore, Inc.*, 626 F.3d 789, 793 (5th Cir. 2010).

law."[7]   When jurisdiction is based on diversity, this court must apply the substantive law of the forum state, here Louisiana.[8]

### A.     Contractual Claim for Formosan Termite Damage Repair

The Cenacs contend that the district court erred in granting summary judgment in favor of Orkin because there are genuine issues of material fact as to whether Orkin is contractually obligated to pay for the cost of repairing the Formosan-related termite damage to their home.  They assert that the district court "overlooked" factual evidence that, if true, would defeat summary judgment.  The Cenacs further argue that the district court failed to consider "clear ambiguities" in the contract forms, as modified by handwriting and originally written.

Under Louisiana law, "interpretation of a contract is the determination of the common intent of the parties."[9]   In ascertaining the common intent, "[t]he words of a contract must be given their generally prevailing meaning."[10] In addition, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."[11]   If the plain text of a contract is subject to two or more reasonable interpretations, a court may look to parol evidence to determine the parties' intent.[12]  Parol evidence, however, may not be used to create ambiguity in an otherwise unambiguous contract.[13]   "Under Louisiana law, the interpretation of an unambiguous contract is an issue of law for the court."[14]

---

[7] FED. R. CIV. P. 56(a).
[8] *Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. v. Tompkins*, 34 U.S. 64 (1938)).
[9] LA. CIV.CODE ANN. art. 2045.
[10] *Id.* art. 2047.
[11] *Id.* art. 2046.
[12] *Am. Elec. Power Co. v. Affiliated FM Ins. Co.*, 556 F.3d 282, 286 (5th Cir. 2009).
[13] *Id.* at 286 n.3.
[14] *Amoco Prod. Co. v. Tex. Meridian Res. Expl. Inc.*, 180 F.3d 664, 668 (5th Cir. 1999).

As this court has described, interpretation of a written contract under Louisiana law "involves a two-step process."[15]  First, the court must look to the plain text of the contract to determine whether its meaning is clear and unambiguous.  If the text is clear and unambiguous, the court may not go beyond the text for further interpretation.  If, however, the plain text is subject to more than one reasonable interpretation, the court may then resort to parol evidence to determine the parties' intent.[16]  "In the context of contract interpretation, only when there is a choice of reasonable interpretations of the contract is there a material fact issue concerning the parties' intent that would preclude summary judgment."[17]  Accordingly, careful review of the text of the agreements at issue is in order.

### 1.    1991 Agreement

The Cenacs' claim that Orkin is contractually obligated to pay for Formosan-related repair costs originates with the 1991 Agreement between Orkin and Eschete.  As stated above, the 1991 Agreement contained an OR Guarantee, obligating Orkin to retreat the house when required and, more importantly, to "repair any new damage" to the house or its contents caused by native subterranean termites.  The district court determined that the entirety of the 1991 Agreement, including the OR Guarantee, was transferred to the Cenacs when they purchased the home.  Orkin does not challenge that ruling on appeal.

Although Orkin agreed to a repair obligation as part of the OR Guarantee in the 1991 Agreement, the contract is clear and unambiguous that Orkin's repair obligation "is strictly limited to any new Subterranean Termite damage."  Moreover, the contract specifically states in the title and at the end

---

[15] *Am. Elec. Power Co.*, 556 F.3d at 286.
[16] *Id.*
[17] *Amoco Prod. Co.*, 180 F.3d at 669.

of the paragraph containing the OR Guarantee that it does not protect against Formosan termites.

The Cenacs contend, however, that in 2007 Orkin agreed to extend its OR Guarantee (and, thus, its repair obligation) to include damage caused by Formosan termites. They acknowledge that they signed two documents at that time—the Special Service Agreement (SSA) and the Continuous Protection Plan (CPP)—relating to their home and shed and that they made two substantial payments to Orkin. The Cenacs assert (and Orkin agrees) that it is unclear which document applies to their home and which document applies to their shed. Nonetheless, they maintain that Orkin's branch manager assured them that Orkin was expanding its OR Guarantee to include Formosan termites. As stated above, however, we must first look to the plain text of the 2007 agreements to determine the parties' intent.

### 2.    CPP

The CPP states that "Orkin shall treat Customer's structure" for Formosan and subterranean termites. It provides for a "10-year renewable Formosan and subterranean termite retreatment service." The agreement specifically states: "This Service does not cover any damage to the structure or contents." The CPP further provides: "Orkin is performing a service and expressly disclaims any guarantee of any kind, whether express or implied for any injury or damage related to the service performed. Customer expressly releases Orkin from any claims for termite damage or repair." These provisions of the CPP clearly and unambiguously show Orkin's intent *not* to undertake any type of termite repair obligation. Moreover, the provisions also clearly and unambiguously establish that the Cenacs agreed to relinquish any claims for termite damage or repair.

The Cenacs, however, assert that the CPP contained "several ambiguities" that should be resolved in their favor for summary judgment

purposes. They point to a note which was handwritten diagonally across the bottom half of the document providing: "Add on to original acct #588129." The Cenacs submit that this handwritten note meant, as the Orkin representative told them, that a repair obligation for Formosan termite damage was being "added to" the original OR Guarantee. We find this argument unpersuasive. The handwritten note did not indicate that it was canceling out the clear and unambiguous provisions limiting Orkin's liability to retreatment only. If anything, the note indicated that a new agreement (the CPP), which provided for *no* termite repair obligation (even as to subterranean termites), was being added to the Cenacs' account. Furthermore, as the district court rightly noted, the CPP contains an integration clause which provides, in pertinent part, that the terms of the CPP "may not be amended or altered unless a written change is approved and signed by a corporate officer of Orkin, and it has been approved by the Louisiana Structural Pest Control Commission." The integration clause further provides: "No other employees or agents of Orkin have authority to amend or alter any part of this Agreement." Consequently, any statements made by an Orkin representative to the Cenacs that Orkin was agreeing to a Formosan termite repair obligation could not alter the clear terms of the CPP.

The Cenacs also point out that on the second page of the CPP, there are two provisions referencing "claims for termite damage repairs" such that there is an ambiguity as to whether the CPP, in fact, excludes such claims. The first sentence states that the customer "waives any claims for damages except for termite damage repairs as set out above." As the district court concluded, however, the CPP does not "set out above" any claims for termite damage repairs, but instead excludes all such claims. The second sentence which begins, "[w]ith the sole exception of any claim for termite damage repairs," also does not render ambiguous the CPP's clear and unambiguous waiver of claims for termite damage on the first page and cannot be read in isolation from the

other terms of the agreement.  In sum, like the district court, we determine that under the CPP, Orkin owed no obligation to the Cenacs to repair any type of termite damage.

### 3.    SSA

The other agreement signed by the Cenacs in 2007, the SSA, contains very few provisions.  Under "type and no. of structures to service," a handwritten note provides, "Residential – 1."  Under "pests to be treated," another handwritten note provides: "Retreat to cover subterranean and Formosan termites."  Under "Special Instructions," the box next to "1 Treatment" is checked.  Next to "Products Purchased," an amount of $1708 is handwritten.  Above the amount, the SSA states: "I agree to pay Orkin Pest Control the below amount at this time for treatment of the pest(s) indicated." Other than a lengthy provision calling for arbitration, the only other substantive provision states: "This Special Service Agreement is guaranteed for 30 days only and WILL NOT provide permanent control.  For CONTINUOUS protection and control, we strongly recommend a REGULAR PEST CONTROL SERVICE."

Like the district court, we conclude that the clear and unambiguous provisions of the SSA obligated Orkin to perform a single treatment with an express warranty disclaimer beyond thirty days.  Nothing in the plain text of the SSA indicates that Orkin was undertaking any type of termite repair obligation or extending its OR Guarantee to include Formosan termites.

The Cenacs nonetheless argue that if the SSA applied to their home, summary judgment should not have been granted in light of the deposition testimony of various Orkin employees.  Specifically, the Cenacs point out that an Orkin employee testified that the SSA form contract was "usually used to . . . add Formosan termite coverage to a contract if it wasn't on there before." The employee also testified that the notation "Formosan coverage" on Orkin's

inspection reports meant that Orkin had completed a supplemental treatment for Formosan termites and that, as a result of that supplemental treatment, the customer's original contract covered Formosan termites as well. The Cenacs submit that the district court erred in limiting its review to the text of the SSA and in not considering the combined effect of the 1991 Agreement, the SSA, and the representations made by Orkin at the time the SSA was signed. The Cenacs urge that the SSA was only part of their overall agreement with Orkin and that the district court should have considered the parol evidence they submitted.

We disagree. Like the CPP, the 1991 Agreement contains an integration clause which governs how changes to the contract could be made. The clause provides, in all caps and bold, that the "Agreement may not be changed in any way by any representative of Orkin or [customer] unless it is changed in writing and signed by a corporate officer of Orkin Exterminating Company, Inc." As described above, the 1991 Agreement contained an affirmative contractual obligation by Orkin to repair termite damage caused by subterranean termites. The contract "strictly limited" Orkin's liability for repairs "to any new Subterranean termite damage" and specifically stated that it did "not protect against Formosan termites." Therefore, an extension of Orkin's *subterranean* repair obligation to include *Formosan* termites would constitute a "change" in the agreement, requiring a writing signed by a corporate officer of Orkin. The SSA does not meet these requirements because, as discussed above, the plain text of the SSA does not establish any termite repair obligation on the part of Orkin and does not extend/expand Orkin's termite repair obligation to include Formosan termites. Furthermore, the SSA is not signed by a corporate officer of Orkin. Therefore, the Cenacs' arguments that the district court erred in not considering the combined effect of the 1991

Agreement, the SSA, and Orkin employees' representations are foreclosed by the integration clause in the 1991 Agreement.

The Cenacs also argue that the termite inspection reports Orkin issued annually confirmed that they had an OR Guarantee type of contract, and Orkin accepted their annual payments each year, never indicating that the OR Guarantee did not apply to Formosan termites. Although the Cenacs are correct that the reports indicate "Guarantee Type OR," immediately preceding that entry on the reports is "Subterranean Termite Svc." Therefore, we find that the inspection reports indicated what the Cenacs had all along—an OR Guarantee with respect to subterranean termites.

Based on the foregoing, the district court did not err in granting summary judgment and dismissing the Cenacs' claim that Orkin was contractually liable for the cost of repairing the damage to their home caused by Formosan termites.

## B.    Claims under Louisiana Unfair Trade Practices Act

The Cenacs assert that they alleged sufficient facts to support a finding that Orkin engaged in deceptive, unethical, oppressive, and/or unscrupulous conduct in violation of the Louisiana Unfair Trade Practices Act (LUTPA). They contend that the confusing and muddled forms Orkin requires its customers to sign are deceptive. The Cenacs submit that the actions of Orkin's representatives, together with its form agreements, provided sufficient summary judgment evidence in support of their LUTPA claim.

LUTPA declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[18] It provides a private action for damages to "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a

---

[18] *See* LA. STAT. ANN. § 51:1405.

result of the use or employment by another person of an unfair or deceptive method, act, or practice."[19]

"It has been left to the courts to decide, on a case-by-case basis, what conduct falls within the [LUTPA]'s prohibition."[20]  The range of prohibited practices under the statute is "extremely narrow."[21]  "[T]he plaintiff must show the alleged conduct 'offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious.'"[22]  "[O]nly egregious actions involving elements of fraud, misrepresentation, deception, or other unethical conduct will be sanctioned based on LUTPA."[23]  LUTPA "does not provide an alternative remedy for simple breaches of contract.  There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes."[24]

The Cenacs argue that Orkin's transactions are inherently imbalanced and not arms-length because Orkin drafts its own "confusing and muddled, if not deceptive, forms."  They contend that they have alleged and provided sufficient summary judgment evidence of Orkin's deceptive and unfair trade practices.

As the district court determined, however, the Cenacs have failed to show that Orkin engaged in the "extremely narrow" range of prohibited practices under the statute, which encompasses only egregious conduct that is "immoral, unethical, oppressive, unscrupulous, or substantially injurious."[25]

---

[19] *See id.* § 51:1409.

[20] *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010) (citation omitted).

[21] *Id.* at 1060.

[22] *Id.* at 1059 (second alteration in original) (quoting *Moore v. Goodyear Tire & Rubber Co.*, 364 So. 2d 630, 633 (La. Ct. App. 1978)).

[23] *Id.* at 1060.

[24] *Id.* (quoting *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993)).

[25] *Id.* at 1059-60 (quoting *Moore*, 364 So. 2d at 633).

Taking as true the Cenacs' allegations that Orkin employees told them on numerous occasions that Orkin was obligated to repair Formosan termite damage, the clear wording of the contracts between the Cenacs and Orkin provided for no such obligation.  The 1991 Agreement specifically states that Orkin's repair obligation was strictly limited to damage by subterranean termites and that any change to the agreement must be in writing; the SSA does not provide for any type of repair obligation; and the CPP specifically excludes Orkin's liability for any type of termite damage.  In light of these agreements, which the Cenacs signed and/or were available to them for review, we agree with the district court that Orkin's conduct did not rise to the level of the egregious conduct LUTPA proscribes.  Based on the foregoing, the district court did not err in granting summary judgment in favor of Orkin dismissing the Cenacs' LUTPA claims.

## C.    Claims in Tort

We part company with the district court in its decision to grant summary judgment dismissing the Cenacs' claims in tort.  In appealing the dismissal of their tort claims, the Cenacs focus on their assertion that in 2013, after Orkin completed an annual inspection of their home, Orkin recommended that they install a vapor barrier under their home.  The Cenacs assert that both parties believe this barrier was "a major factor in causing the termite infestation and damage to their home."  The Cenacs contend that Orkin had no contractual duty to make such recommendation and that "in a separate undertaking, Orkin chose to approach [them] and recommend the installation of a barrier, as well as how to go about installing it."  They maintain that Orkin was negligent or

grossly negligent in such recommendation and instruction and that Orkin's negligence or gross negligence caused and/or contributed to their damages.[26]

Under Louisiana law, "the nature of the duty breached [] should determine whether the action is in tort or in contract."[27]  When a party expressly warrants a specific result and fails to obtain that result, or when the party agrees to perform certain work and does nothing whatsoever, a claim based on such omissions is contractual.[28]  When a contract exists between two parties for one party to provide a service to the other, but "it is not alleged that any *specific* contract provision [duty] was breached," and instead a general duty to perform work in a prudent and skillful manner, the claim arises in tort.[29]  Furthermore, "[i]f a person undertakes a task which he has no duty to perform, he must perform that task in a reasonable and prudent manner. Negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability."[30]

In *Crane v. Exxon Corp., U.S.A.*,[31] the plaintiff, an employee of Merit Industrial Constructors, Inc. (Merit), was injured while working on a construction job at an Exxon plant.  Exxon contracted with Merit to construct facilities for the installation of a compressor at Exxon's Baton Rouge refinery. Reviewing the provisions of the contract between Exxon and Merit, the court

---

[26] The Cenacs also assert that Orkin negligently treated and retreated the home, failed to warn of conditions conducive to termites, and misrepresented that they were covered by an "OR Guarantee" for Formosan termite damage.  The claims regarding treatment/retreatment and failure to warn of conditions conducive to termites fall within Orkin's contractual obligations under the 1991 Agreement, which all parties agree was transferred to the Cenacs and pertains to their house.  And, as discussed in Section B, the Cenacs' claim that Orkin misrepresented that they were covered by an OR Guarantee fails as a matter of law.

[27] *Roger v. Dufrene*, 613 So. 2d 947, 948 (La. 1993) (citation omitted).

[28] *Id.* at 949.

[29] *Trinity Univ. Ins. Co v. Horton*, 756 So.2d 637, 638–39 (La. App. 2d Cir. 2000).

[30] *Crane v. Exxon Corp., U.S.A.*, 613 So.2d 214, 221 (La. App. 1st Cir. 1992) (citations omitted).

[31] *Id.* at 217.

noted that "[c]ontractually, Exxon had no duty to provide a safe place for Merit's employees to work."[32]  Even so, the court found that an Exxon employee "voluntarily assumed the task of monitoring the jobsite for violations of Exxon safety standards by Merit" which "task had as its purpose the protection of Merit employees."[33]    The court concluded that "[h]aving assumed this responsibility, [Exxon] had a duty to perform it in a reasonable and prudent manner."[34]  The court held Exxon "liable for its employee's negligent breach of an assumed duty which resulted in [the plaintiff's] injury."[35]

In this case, the district court dismissed the Cenacs' tort claims, agreeing with Orkin that the Cenacs had no claims in tort against Orkin because all of its obligations to the Cenacs arose out of contract.  The district court, however, did not compare the individual allegations of negligence or gross negligence asserted by the Cenacs to Orkin's obligations as set forth in the various contracts.  With respect to the Cenacs' claim regarding the vapor barrier, Dr. Christopher Cenac testified in his deposition that after Orkin performed an inspection of the house in April 2013, the inspector noted that there was "Excessive Moisture in Crawl" and left his number for Dr. Cenac to contact him.  Dr. Cenac testified that he called Orkin and that the representative informed him about what he could do to fix the problem.  The Orkin representative suggested three things: (1) open up some more areas along the front of the house to have more cross ventilation in the crawl space, (2) install a fan to make the air pass through the space and not sit stagnant, and (3) place a moisture barrier under the home.

---

[32] *Id.* at 221.  In fact, the contract placed that responsibility on Merit.  *Id.* at 221 n.7.
[33] *Id.*
[34] *Id.*
[35] *Id.*

No. 18-31121

Dr. Cenac further testified that the Orkin representative told him that he "[n]eeded to attach [the moisture barrier] to the undersurface of the home." Dr. Cenac stated that Orkin did not offer to perform the service and did not recommend anyone to do the installation. He had a worker on his property "put the moisture barrier up under the home." After Dr. Cenac did the three things the Orkin inspector recommended, he called Orkin, and an Orkin representative went out to the home and "said everything is fine." Orkin also sent the Cenacs a letter on June 18, 2013, stating that all was well and thanking the Cenacs for making the improvements.[36]

None of the contracts between the Cenacs and Orkin—the 1991 Agreement, the CPP, or the SSA—required Orkin to recommend, instruct, or direct its customers on how to remedy conditions conducive to termite infestation. Contrary to Orkin's contentions, the 1991 Agreement does not impose such an obligation on Orkin. The General Terms and Conditions section of the agreement provides: "If such a condition is discovered, I [the customer] will be responsible at my own expense for making any repairs necessary to correct the structural or mechanical problem . . . ." Thus, this provision affirmatively places responsibility on the customer to correct any conditions conducive to termite infestation. Under these circumstances, the Cenacs' claim that Orkin recommended installation of a vapor barrier and approved its allegedly negligent installation does not involve the breach of a specific contractual duty. Rather, Orkin undertook the task of recommending and directing installation of a vapor barrier, which (much like Exxon in *Crane*) it had no obligation to do under its contracts with the Cenacs. Yet, in doing so, Orkin was required under Louisiana law to "perform that task in a reasonable

---

[36] Although a copy of this letter is not in the record, the record indicates that the letter and its conents were specifically discussed during Orkin's Rule 30(b)(6) deposition.

and prudent manner.  Negligent breach of a duty which has been voluntarily or gratuitously assumed may create civil liability."[37]

Based on the foregoing, the district court erred in dismissing the Cenacs' claim that Orkin was negligent or grossly negligent in directing and approving installation of a moisture barrier under their home.  We therefore vacate and remand the district court's judgment with respect to this claim.  We additionally note that the 1991 Agreement and the SSA contain no limitation of liability provisions and no provisions in which the customer was obligated to waive any claims.  We further note that if the CCP is applicable to the Cenacs' house, Article 2004 of the Louisiana Civil Code prohibits any waiver of claims for gross negligence.

### D.     Claims under Louisiana Insurance Code

The Cenacs also allege that Orkin is liable to them for its breach of the duty of good faith and fair dealing under Louisiana Revised Statutes § 22:1973 and for its violation of the duty of prompt payment under § 22:1892.  A prerequisite for the application of these statutes, which are part of Louisiana's Insurance Code, is that the defendant be an "insurer."[38]  The Cenacs allege that Orkin is an insurer within the ambit of these statutes because "it entered into an insurance contract by which it agreed to indemnify the Cenacs for property damage arising out of a specified contingency, namely termite infestation."

As detailed above, however, Orkin did not agree to indemnify the Cenacs for damages caused by Formosan termites.  The 1991 Agreement's repair obligation is strictly limited to subterranean termites.  The 2007 agreements

---

[37] *Crane*, 613 So.2d at 221 (citations omitted).

[38] *See* LA. STAT. ANN. § 22:1973 ("An insurer . . . owes to his insured a duty of good faith and fair dealing."); LA. STAT. ANN. § 22:1892 ("All insurers . . . shall pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured or any party in interest.").

either do not provide for any termite repair obligation (SSA) or expressly disclaim any such obligation (CPP). Based on the foregoing, the district court did not err in granting summary judgment in favor of Orkin and dismissing the Cenacs' claims under the Louisiana Insurance Code.

### E.    Detrimental Reliance Claim.

The Cenacs argue that they are entitled to damages under the doctrine of detrimental reliance. They assert that Orkin employees assured them that they were obtaining a repair guarantee with respect to Formosan termites when they paid additional money in 2007 and signed the SSA and the CPP. They assert, as they did in support of their contractual claims, that they relied on handwritten notes on the contract forms and the notations on the annual inspection reports denoting an OR Guarantee type, which they contend affirmed the Orkin employees' assurances that Orkin extended its OR Guarantee to include Formosan termites.

Article 1967 of the Louisiana Civil Code defines detrimental reliance. It provides:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.[39]

"The doctrine of [detrimental reliance] is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence."[40]  To establish a claim for detrimental reliance, a

---

[39] LA. CIV. CODE ANN. art. 1967.
[40] *Drs. Bethea, Moustoukas & Weaver LLC v. St. Paul Guardian Ins. Co. (Bethea)*, 376 F.3d 399, 403 (5th Cir. 2004) (internal quotation marks and citation omitted).

party must prove three elements: (1) a representation by conduct or word; (2) justifiable reliance on the representation; and (3) a change in position to one's detriment resulting from the reliance.[41]

The Cenacs argue that the question of reasonable reliance is a question of fact inappropriate for summary judgment. Orkin asserts, and the district court agreed, that the theory of detrimental reliance is unavailable to the Cenacs as a matter of law because it would not be justified or reasonable given the express terms of the contracts at issue.

Though "[w]hether a plaintiff reasonably relied on a promise is generally a fact-bound determination . . . , Louisiana law recognizes certain situations where a plaintiff's reliance on a promise is unreasonable as a matter of law."[42] This court has held that a party's reliance on promises made outside of an unambiguous, fully-integrated agreement is unreasonable as a matter of law.[43] "A detrimental reliance claim does not require a determination of whether we should or should not consider parol evidence."[44] Instead, the court "focuses on the reasonableness of a party's professed reliance upon promises made outside the scope of a 'fully-integrated written agreement' between the parties."[45]

This court's decision in *Bethea* is instructive. There, we held that reliance on brochures and a letter—allegedly contradicting an insurance contract—was unreasonable as a matter of law for two reasons.[46] First, the insurance policy unambiguously laid out the terms and "the clarity of the policy

---

[41] *Id.*

[42] *Id.*

[43] *Id.* at 403–05 (applying Louisiana law); *Omnitech Intern, Inc. v. Clorox Co.*, 11 F.3d 1316, 1330 (5th Cir. 1994) (same).

[44] *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 426 F. App'x 232, 237 (5th Cir. 2011) Although an unpublished opinion issued on or after January 1, 1996, is generally not controlling precedent, it may be considered as persuasive authority. *See Ballard v. Burton*, 444 F.3d 391, 401 & n.7 (5th Cir. 2006) (citing 5TH CIR. R. 47.5.4).

[45] *Id.* (citing *Omnitech*, 11 F.3d at 1329–30).

[46] *Bethea,* 376 F.3d at 404-05.

and the informality of the letter" made reliance on the letter unreasonable as a matter of law.[47]  Second, the policy contained an integration clause that "also [made] any reliance unreasonable."[48]  Thus, "[g]iven that the insurance policy unambiguously define[d] the parties' rights and limit[ed] the way to alter the policy, it was unreasonable to rely on informal documents as modifying material aspects of the policy."[49]

This court looks to both the presence of an integration clause and the plain language of the contract to determine whether, as a matter of law, reliance on inconsistent representations is unreasonable.  In this case, the Cenacs cannot seek recovery for damages under the doctrine of detrimental reliance because, as explained above, the 1991 Agreement and the CPP are unambiguous.  The 1991 Agreement clearly states that it was inapplicable to Formosan termites, and the CPP clearly "disclaims any guarantee of any kind, whether express or implied, for any injury or damage related to the service performed. Customer expressly releases Orkin from any claims for termite damage and repair."  Furthermore, both agreements contain integration clauses, which provide that the written contracts "make up [the] complete agreement with Orkin and that this agreement may not be changed in any way by any representative of Orkin . . . unless it is changed in writing . . . ."  Under this precedent, as a matter of law, the Cenacs cannot reasonably rely on the representations of Orkin's employee, even if true, because those representations conflict with the clear meaning of the contract terms.[50]

---

[47] *Id*. at 405.

[48] *Id*.

[49] *Id.*

[50] The Cenacs' reliance on a district court case, *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 638 F.Supp.2d 619 (M.D. La 2009), to support their position is misplaced.  This court reversed that holding on appeal, concluding that "Water Craft's reliance on the oral agreements was unreasonable as a matter of law because the [contracts] are unambiguous

No. 18-31121

The Cenacs contend that the SSA does not contain an integration clause and that Orkin employees testified in their depositions that the SSA form was regularly used to "add Formosan termite coverage to an existing contract." Yet, as discussed above, the 1991 Agreement strictly limited Orkin's liability for repairs to subterranean termite damage, and its integration clause required that any changes to the agreement be made in writing and signed by a corporate representative.  An extension of Orkin's repair obligation beyond subterranean termites to include Formosan termites would constitute a "change" in the 1991 Agreement, requiring a writing signed by a corporate officer of Orkin.  The SSA does not meet these requirements because, as discussed above, the plain text of the SSA does not establish any termite repair obligation on the part of Orkin and does not extend/expand Orkin's termite repair obligation to include Formosan termites.  Furthermore, a corporate officer of Orkin did not sign the SSA.  Moreover, the clear and unambiguous provisions of the SSA obligated Orkin to perform a single treatment with an express warranty disclaimer beyond thirty days.  The Cenacs' argument that their detrimental reliance claim can be founded on the SSA is without merit.[51] We determine that the district court did not err in dismissing the Cenacs' detrimental reliance claim.

## IV. CONCLUSION

Based on the foregoing reasons, we affirm the district court's dismissal of all the Cenacs' claims, except their claim that Orkin was negligent and/or grossly negligent in directing and approving installation of a vapor barrier

---

written contracts with well-defined terms and valid integration clauses." *Water Craft Mgmt., L.L.C. v. Mercury Marine*, 426 Fed. Appx. 232, 237 (5th Cir. 2011).

[51] Moreover, as also addressed above, the termite inspection reports Orkin issued annually did not confirm that the Cenacs had an OR Guarantee type of contract for Formosan termites.

No. 18-31121

under their home.  As to that claim, we vacate the district court's judgment and remand for further proceedings consistent with this opinion.

AFFIRMED IN PART; VACATED IN PART and REMANDED.